UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SYLVESTER JOSEPH and
KHAINTTE THOMPSON,

　　　　　　　　　　　　　　　Defendants.

**REPORT AND
RECOMMENDATION**
12-CR-363A

## I.　INTRODUCTION

The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b).  Pending before the Court are motions by defendants Sylvester Joseph and Khaintte Thompson (Dkt. Nos. 26, 28)[1] to transfer this case under Rule 21(b) of the Federal Rules of Criminal Procedure ("FRCP").  Defendants seek transfer to the United States District Court for the Middle District of Pennsylvania in Harrisburg, where they are two of 10 defendants in a fraud conspiracy case pending before the Hon. William W. Caldwell.  *See U.S. v. Russ*, No. 12-CR-325 (M.D. Pa.) (the "Pennsylvania Case").  Defendants contend that the counterfeiting charges pending here relate to the Pennsylvania Case and that the alleged conduct here represents, at most, overt acts in

---

[1] Defendant Thompson's motion technically is a motion for joinder in Joseph's motion.

furtherance of the conspiracy set forth in the Pennsylvania Case. The Government does not oppose the motions.

The Court has deemed the pending motions submitted on papers because, before defendants filed motions, it discussed the propriety of a transfer with the parties during three prior proceedings. (*See* Dkt. Nos. 22, 23, 24.) For the reasons below, the Court respectfully recommends granting the motions.

## II. BACKGROUND

Although this case officially began a few weeks before the Pennsylvania Case, it represents one act in furtherance of the alleged scheme to steal identities and bank funds set forth in the Pennsylvania Case. On October 30, 2012, Niagara Falls (New York) Police received a call from Pennsylvania State Police indicating that certain rental vehicles likely were in the area.[2] Niagara Falls Police located the vehicles, located and identified Thompson as one person associated with the vehicles, and arrested her on an outstanding Pennsylvania warrant. During a search incident to Thompson's arrest, officers found $4,100 in counterfeit currency in Thompson's underwear. Meanwhile, Cheektowaga Police also received a call on October 30, 2012 from Pennsylvania State Police. The

---

[2] The affidavit supporting the pre-indictment complaint against Thompson does not clarify whether these rental vehicles had been reported stolen. (Dkt. No. 1(1) at 3 ¶ 5.) In contrast, the rental vehicle mentioned in Joseph's complaint was reported stolen. (Dkt. No. 1 at 4 ¶ 7.) The Court infers that Pennsylvania State Police called Niagara Falls Police in the first place because the vehicles associated with Thompson had been reported stolen also.

2

call to Cheektowaga Police indicated that defendant Joseph likely was in the area with a rental vehicle reported stolen.  Cheektowaga Police found the vehicle on the road and initiated a traffic stop.  Officers arrested all six occupants of the vehicle, including Joseph.  During a search incident to Joseph's arrest, officers found $5,500 of counterfeit currency hidden between Joseph's pants and underwear.  On November 14, 2012, both defendants made initial appearances before this Court on complaints (Dkt. Nos. 1, 1(1)) charging each of them with counterfeiting in violation of 18 U.S.C. § 472.  On November 28, 2012, a grand jury indicted both defendants on counterfeiting charges.  (Dkt. No. 6.)

Within weeks of the filing of this case, an ongoing investigation in Pennsylvania culminated in the filing of the indictment in the Pennsylvania Case on December 19, 2012.  The indictment in the Pennsylvania Case contains four counts, alleging bank fraud, wire fraud, and aggravated identity theft.  According to the indictment, Thompson, Joseph, and eight others conspired to defraud victims and their banks by stealing checkbooks, credit cards, and other identification documents from unattended cars in Pennsylvania state parks.[3]  The

---

[3] Without infringing on the presumption of innocence or speculating about the Government's proof in the Pennsylvania Case, the most direct connection between the two cases likely concerns stealing money in Pennsylvania and converting it to higher-denomination, counterfeit currency.  (*See* Dkt. No. 1 at 6 (stating in support of the pre-indictment complaint that currency paper "cannot be purchased and is exclusively used for the production of United States currency.  In an attempt to defeat this security feature, counterfeiters use chemicals to remove all of the ink, or "bleach," genuine $1 Federal Reserve Notes.  Once they

conspirators allegedly would make withdrawals at banks with the stolen checks and would use the stolen credit cards for purchases. The Pennsylvania Case indictment does not mention counterfeit currency but does mention the use of rental cars to travel between Pennsylvania and Florida "as well as other locations outside of the district." (Pa. Case Dkt. No. 1 at 2.) Four of the defendants appear to have pleaded guilty (Pa. Case Dkt. Nos. 101, 112, 131, 144); trial for the other six defendants currently is set for September 9, 2013.

Thompson and Joseph filed the pending motions for transfer in this case on May 20 and 24, 2013. Thompson and Joseph cite several factors in favor of transfer. Both defendants currently are detained in Pennsylvania where the Pennsylvania Case is proceeding. Most of the investigative work leading to the arrests in Niagara Falls and Cheektowaga originated in Pennsylvania, including the telephone calls from Pennsylvania State Police about stolen rental vehicles. Some law enforcement agents in this District necessarily would be witnesses to defendants' alleged conduct, but they would have to travel to Pennsylvania anyway for the trial in the Pennsylvania Case. The United States Attorney's Offices for both this District and the Middle District of Pennsylvania have spoken to each other and agree that transfer would be appropriate.

---

have the blank United States currency paper, counterfeiters then print a denomination considerably higher than the $1 to make a profit."); Dkt. No. 1(1) at 5–6 (same).)

## III.  DISCUSSION

### A.  *Are the Pending Motions Dispositive?*

Before addressing the merits of the pending motions, the Court needs to address whether the motions are dispositive and require a Report and Recommendation to Judge Arcara.  The Second Circuit appears not to have addressed the issue directly, and judges in this District have reached different conclusions for FRCP 21(a) and 21(b) motions made in criminal cases. *Compare, e.g.*, *U.S. v. Bazzi*, No. 07–CR–212(A)(M), 2010 WL 4451454, at *7–8 (W.D.N.Y. Apr. 21, 2010) (McCarthy, *M.J.*) (assuming that an FRCP 21(b) motion was nondispositive and proceeding to a ruling) *with U.S. v. Kopp*, No. 00-CR-189, 2005 WL 839672, at *3–4 (W.D.N.Y. Apr. 11, 2005) (Scott, *M.J.*) (Report and Recommendation) (assuming that an FRCP 21(a) motion was dispositive). This Court has held in the civil context that transfer motions are dispositive because "so far as this Court is concerned the action would no longer exist and that decision is essentially dispositive as to this Court." *Cott Corp. v. Decas Botanical Synergies, LLC*, No. 11-CV-552A, 2011 WL 9082627, at *4 (W.D.N.Y. Dec. 23, 2011) (Scott, *M.J.*) (Report and Recommendation, adopted Sept. 19, 2012 (Dkt. No. 56)).  With the case law on this issue unsettled, prudence warrants the more cautious approach of a Report and Recommendation.  At worst, treating the pending motions as dispositive will

5

introduce a slight delay as Judge Arcara reviews this Report and Recommendation. This Court will proceed accordingly.

### B. *Transfer Under FRCP 21(b)*

The Court now will assess the substance of the pending motions. "Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." FRCP 21(b). "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court. In deciding such a motion, the court should consider such factors as (a) location of the defendants; (b) location of the possible witnesses; (c) location of the events likely to be at issue; (d) location of relevant documents and records; (e) potential for disruption of the defendants' businesses if transfer is denied; (f) expenses to be incurred by the parties if transfer is denied; (g) location of defense counsel; (h) relative accessibility of the place of trial; (i) docket conditions of each potential district; and (j) any other special circumstance that might bear on the desirability of transfer. No one of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *U.S. v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (editorial marks, internal quotation marks, and citations omitted). Accordingly, courts over the years have avoided taking a rigid approach to a transfer motion. "The beneficent purposes of Rule 21(b) will be

6

thwarted . . . if it is supposed that there is a general rule that a criminal prosecution should be retained in the original district. There should be no general rule whatever on the subject, although it is proper to require the defendant, as the moving party, to carry the burden of showing why a transfer would serve the purposes specified in the rule. Instead of applying a supposed general rule, the court should examine all the circumstances of the particular case and determine what place of trial will best serve convenience and the interest of justice in that case." 2 Charles Alan Wright et al., *Fed. Prac. & Proc. Crim.* § 345 (4th ed. and Supp. 2013) (internal quotation marks and citations omitted).

Here, several factors favor transfer. Thompson and Joseph are in custody in Pennsylvania awaiting trial in the Pennsylvania Case. The existence of the Pennsylvania Case and the pace at which it has proceeded distinguishes this case from others where courts denied transfer to a district that was unfamiliar with the case and had no related proceedings ongoing. *Compare, e.g., U.S. v. Spy Factory, Inc.*, 951 F. Supp. 450 (S.D.N.Y. 1997) (denying transfer from New York to Texas where defendant was not facing any charges in Texas) *with U.S. v. Prescott*, No. 90 CR 70, 1990 WL 127577, at *2 (E.D.N.Y. Aug. 28, 1990) (granting transfer from New York to Louisiana in part because "the U.S. Attorney's Office in Louisiana has been notified about the status of this case and, presumably, prosecution will be able to proceed upon transfer. The Court also

7

notes that the initial Grand Jury investigation of this matter took place in Baton Rouge, Louisiana."). Related to that point, the Pennsylvania Case appears to be considerably larger than this case, meaning that Pennsylvania prosecutors can subsume this case into that one with little effort, as a manifestation of the broader conspiracy in that case. *Cf. U.S. v. Martino*, No. S1 00 CR 389(RCC), 2000 WL 1843233, at *7 (S.D.N.Y. Dec. 14, 2000) (granting a transfer from New York to Florida in part because "[t]he government does not dispute defendant's contention that all of the securities deals which generated the alleged unreported income were solicited, negotiated and executed from Florida"); *U.S. v. Alter*, 81 F.R.D. 524, 526 (S.D.N.Y. 1979) (granting transfer from New York to Florida where "[i]t is beyond dispute that most, if not all, of the acts and conduct in furtherance of the alleged scheme to defraud occurred in Miami and that it was the 'nerve center' of the alleged illicit operations in carrying on the scheme, and many persons were participants in such activities."). To the extent that the counterfeit currency found with Thompson and Joseph came from bleached and reprinted currency stolen in Pennsylvania, all of the victims in the Pennsylvania Case are from Pennsylvania. Any law-enforcement witnesses and documents connected to this case likely will be part of the Pennsylvania Case, which means that the prosecutors in Pennsylvania may choose to merge this case into the Pennsylvania Case. At the same time, all sides likely would have to call witnesses from Pennsylvania if this case went to trial here. *Cf. U.S. v. Hanley*,

8

No. 94 Crim. 394 (DAB), 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995) (granting transfer from New York to California in part because "[o]n balance it appears that a trial in Los Angeles, rather than in New York, would be more convenient for most of the witnesses").

In sum, this case traces its origins to Pennsylvania well enough that letting both cases reach their ultimate conclusions together in the same place will be convenient for Thompson and Joseph and will serve the interests of justice.

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting defendants' pending motions to transfer (Dkt. Nos. 26, 28). If Judge Arcara adopts this Report and Recommendation then the Clerk of the Court should be directed to take the steps necessary to transfer this case to the Middle District of Pennsylvania in Harrisburg in accordance with FRCP 21(c).

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

                                                 */s/ Hugh B. Scott*
                                                 HONORABLE HUGH B. SCOTT
                                                 UNITED STATES MAGISTRATE JUDGE

DATED: August 26, 2013